Olivia D. CUMMINGS, Executrix of the
Estate of Ernest W. Cummings,
Deceased, Plaintiff,

v.

FEDERAL KEMPER LIFE
ASSURANCE COMPANY,
Defendant.

No. CIV 3-91-0718.

United States District Court,
E.D. Tennessee,
Northern Division.

Oct. 18, 1995.

Gregory C. Logue, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, TN, for plaintiff.

Stephen E. Roth, Heiskell, Donelson, Bearman, Adams, Williams & Caldwell, Knoxville, TN, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

This civil action came on for trial without a jury on July 2, 1993. After the trial, the court considered evidence which the parties offered in the form of deposition testimony and exhibits to the depositions. The court is now prepared to rule on the case. The following are the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

I

Many of the relevant facts are stated in the pretrial order entered in this civil action [doc. 10]. The late Ernest W. Cummings, together with other shareholders of Drain–All, Inc., a closely held corporation, decided to enter into a shareholders' agreement under which the corporation would purchase a deceased shareholder's shares, and, for the purpose of funding its obligations arising out of this agreement, would hold a policy of life insurance covering the life of each shareholder. Mr. Cummings applied for the policy to cover his life, in the amount of $1,000,000.00, on December 22, 1989.[1]

---

1. After the events with which this lawsuit is concerned, Drain–All, Inc. assigned all of its rights under the policy in issue to the plaintiff executrix. The parties made no issue in this litigation concerning the validity of this assignment or the plaintiff executrix' standing to prosecute this lawsuit.

In his application, Mr. Cummings stated his medical history as he knew it. He underwent a physical examination, which the insurer, the defendant Federal Kemper Life Assurance Company (Kemper), required. This examination revealed no health problems.

Between the time when he first applied for this policy and underwent a physical examination, and when he signed an amendment to his application, on the basis of which Kemper issued the policy in issue, Mr. Cummings experienced pain in his left ear. He visited a physician, who diagnosed Mr. Cummings' condition as an ear infection with localized swelling of the lymph node near his left ear. This physician prescribed treatment with an antibiotic. A few days after Mr. Cummings visited his physician, the pain and swelling subsided.

On April 10, 1990, Mr. Cummings met with an agent of Kemper to sign the amendment to his application. In this amendment, Mr. Cummings stated that the representations in his original application were true, that he had not suffered any illness or injury since the date of his original application, and that he had not consulted a physician since that date. Mr. Cummings did not disclose his visit to his physician for treatment of what he believed was an ear infection combined with swelling of one lymph node.

The unfortunate truth is that, unknown to anyone on April 10, 1990, Mr. Cummings' condition was much more serious. After the issuance of the life insurance policy in issue, Mr. Cummings suffered a recurrence of the symptoms of pain and swelling, and his physician recommended a biopsy. Study of the tissue taken from him on May 17, 1990 showed the presence of melanoma. On May 30, 1990, Mr. Cummings underwent surgery, which was followed by radiation therapy. Mr. Cummings died on December 22, 1990.

The court will state additional findings of fact below, in the context of its discussion of the issues and evidence presented.

II

Kemper defended against liability on the life insurance policy in issue on the ground of Mr. Cummings' misrepresentation in the amendment to his application. The applicable statute, Tennessee Code Annotated § 56–7–103,[2] states,

No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

The parties stipulated that in omitting to note in the amendment to his application his recent visit to and treatment by his physician, Mr. Cummings did not disclose the truth. Kemper disavowed any intention to prove at trial that Mr. Cummings had the intent to deceive when he neglected to note that he had visited his physician for treatment of the pain and swelling in and around his left ear. There certainly was no evidence of any such intent on Mr. Cummings' part. The whole case therefore depends on whether this unintentional omission was "material," that is, whether it increased Kemper's risk of loss. In an agreed order drawn by the parties' attorneys,[3] they framed the issues for trial as:

a. What precise matter or matters did Ernest Cummings misrepresent to Kemper?

b. Did the matter or matters misrepresented by Ernest Cummings increase Kemper's risk of loss under Tenn.Code Ann. § 56–7–103?[4]

The parties did not dispute the defendant Kemper's burden with respect to these is-

---

2. The parties did not dispute that Tennessee law governs this diversity action.

3. The court found commendable and refreshing the degree of cooperation and professionalism displayed by counsel for these parties in preparing and trying this civil action.

4. The plaintiff stated in her complaint a claim for the bad faith penalty provided by Tennessee Code Annotated § 56–7–105, but she agreed before trial not to seek a penalty.

sues. "The burden of establishing a 'misrepresentation' defense is clearly placed on the insurance company." *McDaniel v. Physicians Mutual Insurance Company*, 621 S.W.2d 391, 393 (Tenn.1981).

## III

There was no dispute concerning the court's jurisdiction of the subject matter of this civil action. The plaintiff is a citizen of the State of Tennessee, as was her husband before his death. Kemper is a corporation organized under the laws of the State of Illinois, and has its principal place of business there. The amount in controversy, the face amount of the life insurance policy, is well in excess of $50,000.00. The court concludes that it has jurisdiction of the subject matter of this civil action under 28 U.S.C. § 1332.

## IV

The court can summarize the evidence presented at trial as follows. Kemper, having the burden of proof, presented its evidence first. Steven MacDonald, its chief underwriter, testified first. Mr. MacDonald has a bachelor's degree in biology from Boston College; he is not a physician. He has knowledge concerning what to look for in medical records and how what is found in such records should affect the underwriting of life insurance, gained through experience in the insurance industry. As chief underwriter, Mr. MacDonald reviews medical records and histories to determine whether Kemper should issue life insurance policies on the applications under review, and he supervises others' reviews of similar records for this purpose. Mr. MacDonald was consulted twice concerning Mr. Cummings' application for life insurance.

In Mr. Cummings' initial application for this insurance, it is noted that he had a condition of high blood pressure, but that it was under control. Mr. MacDonald testified that an underwriter looks to see whether an applicant's hypertension is under control. The only other items concerning Mr. Cummings' medical history disclosed in this application were a double hernia, for which Mr. Cummings had undergone surgery some

years before, and treatment with an antibiotic for sinusitis. Mr. MacDonald stated that these items were insignificant from the underwriter's point of view.

A printed statement on this application form states, "I (we) promise to tell the Company of any change in the health or habits of the Proposed Insured that occurs after completing this application, but before the Policy is delivered to me (us) and the first premium is paid." Mr. Cummings signed the page on which this statement appears, as he signed all of the pages of the application on which signature lines appear.

Mr. Cummings consulted his physician, Luis Ordonez, M.D., on April 2, 1990. Dr. Ordonez' notes show that Mr. Cummings was complaining of swelling in the lymph node and ear on the left side of his head and neck, and that he had been ill with this condition during the previous two weeks. Dr. Ordonez' notes indicate a diagnosis of an infected lymph node, after which the physician (or his assisting nurse) wrote "R/O," but did not state what he intended to rule out. Dr. Ordonez treated Mr. Cummings' condition conservatively, with an antibiotic.

On April 10, 1990, Mr. Cummings signed the amendment to his application, which states in reference to his December 22, 1989 application:

> THE REPRESENTATIONS MADE IN THE APPLICATION ARE STILL VALID AS OF THE DATE OF THIS AMENDMENT, AND THE PROPOSED INSURED HAS NOT HAD ANY ILLNESS OR INJURY, AND HAS NOT CONSULTED, OR RECEIVED MEDICAL ADVICE OR TREATMENT FROM, ANY PHYSICIAN OR OTHER MEDICAL PRACTITIONER SINCE THE DATE OF THE APPLICATION EXCEPT AS FOLLOWS:

The space after this statement is blank. Kemper therefore issued the policy in issue without any knowledge concerning the April 2 visit to Dr. Ordonez.

On April 13, 1990, while on vacation on Hilton Head Island, Mr. Cummings presented at a hospital emergency room, complaining of swelling behind his left ear, accompa-

nied by pain in the ear. He gave a two-to-three-week history of pain in the left ear with tenderness, and a lump beneath the ear. The examining physician observed the swollen gland, diagnosed acute otitis externa, advised Mr. Cummings to continue to take the antibiotics which Dr. Ordonez had prescribed for him, and gave Mr. Cummings some ear drops to apply. This physician, Julian Hardaway, M.D., advised Mr. Cummings to return to see his personal physician. Dr. Hardaway's notes do not describe Mr. Cummings' left cervical lymph node with any specificity, and do not state its dimensions.

On April 25, 1990, Mr. Cummings consulted Grady Arnold, Jr., M.D. Dr. Arnold's notes of this examination are as follows:

> 4-25-90: The patient developed some gurgling in his left ear and swollen lymph nodes on the left approximately 3 weeks ago and was placed on antibiotics on 4–13. He is using Cortisporin Suspension in the left ear, which feels a little better.
>
> ENT EXAM: Exam reveals 2 large nodes in the left neck just below the mastoid. The ear canal is filled with Cortisporin Suspension. This is cleaned out. The ear looks good. Tympanogram is normal. Audiogram reveals a little sensorineural hearing loss.
>
> PLAN: Return in 2 weeks for recheck. Is given decreasing doses of Prednisone. Tumor must be ruled out if this lymphadenopathy does not go away.

On April 26, 1993, a dermatologist, Clark E. Julius, M.D., removed two lesions from Mr. Cummings, one from his scalp, and one from his neck. Pathological study showed both lesions were benign; the latter was a neurofibroma. There is nothing in Dr. Julius' notes to indicate that Mr. Cummings complained to him about swelling or tenderness on the left side of his neck, or that Dr. Julius noticed anything unusual about Mr. Cummings' left ear or a lymph node on the left side of his neck.

It is useful at this point in the court's consideration of Mr. MacDonald's testimony and of the course of Mr. Cummings' illness to consider the underwriting manual which Mr. MacDonald used during the relevant time period. Concerning the lymph nodes, the manual states, "Lymphadenopathy (enlargement of the lymph nodes) is of crucial underwriting importance because of the serious impairments that may cause it and the frequency with which it is encountered." The manual states that localized enlargement of a lymph node is of less concern to an underwriter than generalized enlargement of the nodes, because the former is usually related to infection, while the latter may be related to such diseases as acquired immune deficiency syndrome (AIDS), or a malignancy. It also states that an enlarged node in the region of the neck or of the groin is of less concern to an underwriter than one in the region of, among others, the elbow or the abdomen.

According to this manual, swelling of less than three months' duration is of less concern to the underwriter than swelling which has lasted longer, a smaller enlarged node is of less concern than a larger one, and a "[c]learly defined diagnosis or cause (infection, trauma), no other symptoms" is more favorable to issuance of the policy applied for than "[n]o known cause, previous malignancy, weight loss, prolonged fever, night sweats, persistent fatigue or diarrhea, loss of appetite, unusual infections (thrush, etc.)." The manual warns the underwriter,

> In all cases, the underwriter must proceed with caution even if a biopsy was performed and there does not appear to be any underlying impairment. This is especially true if: (1) it is not known if a generalized lymphadenopathy has resolved completely, (2) a definite diagnosis (i.e., a diagnosis other than "reactive hyperplasia" or "chronic lymphadenitis") has not been established, or (3) there are other symptoms suggestive of an underlying impairment.

Concerning otitis externa, the underwriter's manual calls for no underwriting action adverse to the application if the condition is "[m]ild, not disabling, with or without otorrhea, no complications," or if the applicant has recovered from it, but calls for postponement of issuance of the policy in other cases.

Mr. MacDonald testified that had he known of Mr. Cummings' visit to Dr. Ordo-

nez, he would have postponed issuance of the policy applied for pending Kemper's receipt of more information concerning Mr. Cummings' condition. Mr. MacDonald testified that he would have been concerned that when Mr. Cummings visited Dr. Ordonez, the insured had been experiencing pain and swelling for two weeks. Mr. MacDonald testified that as an underwriter, he would also have been concerned that Dr. Ordonez did not order any test of Mr. Cummings' blood, and did not perform any other testing for the purpose of differential diagnosis. According to Mr. MacDonald, because Dr. Ordonez' notes of the April 2 visit do not disclose any information about the size or appearance of the swollen node, whether it seemed tender or not, Kemper would have required more information before issuing this policy, had it received a copy of Dr. Ordonez' notes.

Had Mr. Cummings disclosed his visit to Dr. Ordonez, Kemper, according to Mr. MacDonald, would have sought medical records, which would have taken an additional two weeks. Assuming that Kemper received Mr. Cummings' amendment to his application on the earliest date possible, April 18, 1990, and adding to the two weeks two more days for delivery of the application and related material to an underwriter, the application would have come under review about May 4, 1990.

By May 4, as stated above, Mr. Cummings had visited the emergency room on Hilton Head Island. Mr. MacDonald testified that had he or another underwriter seen Dr. Hardaway's notes of this examination, the history of up to three weeks of pain, tenderness, and swelling, combined with the absence of testing and of a definitive diagnosis, would have dictated postponement of issuance of the policy applied for. Also by May 4, Dr. Arnold had examined Mr. Cummings, and his plan to rule out a tumor if the lymphadenopathy did not resolve would, Mr. MacDonald testified, likewise would have piqued an underwriter's interest, and delayed issuance of the policy pending definitive diagnosis. Had Kemper learned eventually of Mr. Cummings' malignant melanoma, it would not have issued a policy of insurance covering his life.

Mr. MacDonald explained that while an underwriter is not a physician, neither is a physician an underwriter. A medical diagnosis is subject generally to revision on the basis of new information, but once an insurer issues a life insurance policy, an underwriter cannot revoke or cancel it on the basis of information gathered through examination or testing performed after the issuance of the policy. The underwriter's decision concerning whether to issue a life insurance policy is not a diagnosis made for the purpose of prescribing a course of treatment, but is instead a decision whether to accept, in consideration of the payment of premiums, the risk that the insured will die sooner than expected. In this context, Mr. MacDonald explained that an underwriting manual provides guidelines which must be read as a whole and in the light of common sense, and that the guidelines are never read to mandate issuance of a policy.

Kemper presented also the testimony of Denny Blalock, Southern Farm Bureau Insurance Company's vice president in charge of underwriting. Mr. Blalock's testimony supported that of Mr. MacDonald in all respects. The court found Mr. MacDonald and Mr. Blalock to be credible witnesses, and found them fully qualified to state their opinions concerning underwriting matters in general and as applied to the facts of this case.

The plaintiff called as a witness Dennis Ray Toomey, the agent who sold the policies insuring the lives of the Drain–All, Inc. shareholders. Mr. Toomey testified that had premium checks been delivered to him earlier, the policy in issue would have been delivered without any requirement that Mr. Cummings sign an amendment to his application concerning his continuing good health. Mr. Toomey conceded that no such check had been delivered to him earlier, however, which makes irrelevant the speculative assertion that this policy could have been issued before Mr. Cummings' visit to Dr. Ordonez. There is no dispute here over Kemper's right to require the amendment to the application, and to delay issuance of a life insurance policy pending further examination of an applicant.

The plaintiff also testified. She testified that her late husband spoke to her by telephone in March, 1990, at which time he mentioned that his ear was bothering him. He did not complain of pain, he was not incapacitated, and he did not express any concern over this. The plaintiff encouraged her husband to visit Dr. Ordonez.

When Mr. Cummings visited the emergency room on Hilton Head Island, he admitted to the plaintiff that he had not taken all of the antibiotic which Dr. Ordonez had prescribed for him, and that before he saw Dr. Ordonez, he had scratched in his left ear with a key. The plaintiff testified that Mr. Cummings improved within 24 hours after he was seen by Dr. Hardaway in the emergency room. Mr. Cummings continued with his usual activities, the plaintiff testified, and, at her urging, visited Dr. Arnold.

The parties submitted the testimony, by deposition, of some physicians involved in this case. Dr. Ordonez testified at his deposition that the notation "R/O" in his notes of the April 2, 1990 visit is incomplete. He testified that he wanted "to rule out a possibility of an abscess in the painful lymph node," and that he saw nothing on April 2 which in his opinion indicated a need for a biopsy. Dr. Ordonez stated that a contradictory recollection included in his short-stay summary concerning Mr. Cummings' stay at Woods Memorial Hospital in August, 1990 is erroneous, which the court accepts.

An expert witness presented by the plaintiff, Ronald K. Sandberg, M.D., stated his opinions firmly. Dr. Sandberg testified that "there was no possible human way for [Dr. Ordonez] to know that [Mr. Cummings] had malignant melanoma" on April 2, 1990, when Dr. Ordonez saw him. Dr. Sandberg testified similarly that there was nothing about Mr. Cummings' condition on April 13, 1990 which should have alerted Dr. Hardaway to anything besides an ordinary illness.

Dr. Sandberg testified also that malignant melanomas in the neck are rare. It would have been "absolutely impossible for [Dr. Ordonez and Dr. Hardaway] to have even wildly guessed that [Mr. Cummings] had malignant melanoma," according to this expert.

Had he been the attending physician on either April 2 or April 13, Dr. Sandberg testified, he would have diagnosed an external ear infection with a reactive infected lymph node. He would not have ordered a biopsy. Dr. Sandberg stated this well in his affidavit filed in this civil action:

[A] physician presented with a request by an insurance company for information concerning Mr. Cummings' medical condition in April of 1990 would have responded that Mr. Cummings had an ear infection with some attendant swelling in the cervical lymph node. Such a condition is very common, is not serious, and has no long-term effect on mortality rates.

Dr. Sandberg conceded, however, that the persistence of pain and swelling is important in judging the seriousness of a condition. While two weeks' persistence, as when Mr. Cummings presented to Dr. Ordonez, would not have seemed significant to Dr. Sandberg, a month's persistence would have caused some concern, he stated, and would have called for further evaluation.

The testimony of James L. Netterville, M.D., a Vanderbilt University otolaryngologist who specializes in head and neck cancer surgery, and whom Mr. Cummings consulted, is not inconsistent with that of Dr. Sandberg. Dr. Netterville testified that his rule of thumb is that in the absence of any strong indication of malignancy, he would follow a patient with a mass for about three months before reassessing his diagnosis or considering surgery. He stated that this rule varies, of course, in either direction, depending on the other aspects of a particular patient's case. He testified that he was surprised at the finding of malignant melanoma in Mr. Cummings' neck.

V

The applicable law is "well settled". *Womack v. Blue Cross and Blue Shield of Tennessee,* 593 S.W.2d 294, 295 (Tenn.1980). Whether the answers made by an applicant for insurance to the questions on the application were true is a question of fact, while whether a false answer materially increased the insurer's risk is one of law. *Id.* It is not necessary that the matter misrepresented be

related to the reason for the claim made under the policy (such as the insured's death in the case of a life insurance policy); it need only have been a misrepresentation about a matter of sufficient importance to have naturally and reasonably influenced the insurer's decision to accept the risk. *See Independent Life Insurance Company v. Russell,* 18 Tenn.App. 622, 624–27, 80 S.W.2d 846, 847–48 (1934), *cert. denied, id.* (Tenn.1935), and authorities cited therein.

■ The question presented in this case, then, is whether Kemper, knowing of Mr. Cummings' visit to Dr. Ordonez, but without the hindsight made perfect by the subsequent course of events, would have delayed issuance of this life insurance policy until the discovery of Mr. Cummings' malignant melanoma made life insurance unavailable to him. The court concludes that Kemper has carried its burden in this regard, through the positive testimony of Mr. MacDonald and of Mr. Blalock.

Had Mr. Cummings disclosed on the amendment to his application his visit to Dr. Ordonez, Kemper would have wanted to see more medical records. As Mr. MacDonald testified, a request for medical records would have delayed consideration of Mr. Cummings' application by an underwriter until at least May 4, 1990, by which time the records created for the underwriter's consideration would have been those of the April 2 examination by Dr. Ordonez, the April 13 visit to the emergency room on Hilton Head Island, and the April 25 examination by Dr. Arnold, who stated explicitly that "[t]umor must be ruled out if this lymphadenopathy does not go away."

The court concludes that Kemper would not merely have reviewed Dr. Ordonez' records and then issued the policy applied for. Dr. Ordonez provided too few details to satisfy a reasonably cautious underwriter. Further investigation would have led to review of the other physicians' records, and this in turn would have led to delay of issuance of the policy until a more definitive diagnosis ruled out the possible unfavorable explanations of this lymphadenopathy, which never occurred.

■ All of what is found in Dr. Ordonez', Dr. Hardaway's, and Dr. Arnold's notes would have, the court concludes, made the reasonable underwriter hesitate to accept a $1,000,000.00 risk without the more definitive diagnostic testing which led to the discovery of cancer in Mr. Cummings' case. The court does not disregard the opinion testimony of Dr. Sandberg, but instead concludes that it misses the point. There is nothing to criticize in Dr. Ordonez' and Dr. Hardaway's decisions not to order more testing; as physicians, they acted in accordance with the applicable standard of care in not suspecting the presence of malignant melanoma on the basis of the diagnostic criteria observed by them. Kemper, however, was not bound by this standard of care, nor was it operating under any mandate to insure Mr. Cummings' life. It was free to be more cautious than any physician was required to be, and, the court concludes, would have been much more cautious had it known of the swollen lymph node observed by Dr. Ordonez.

While Dr. Sandberg states that any physician, in response to Kemper's inquiry, would have stated a diagnosis of ear infection accompanied by reactive swelling of the left cervical lymph node, the court concludes that Kemper would not have been content to accept such a diagnosis without further testing. Neither Dr. Ordonez' notes nor Dr. Hardaway's provide much information concerning the dimensions, appearance and other aspects observed through gross examination of the swollen lymph node. Neither physician's diagnosis is very specific. No one reading Dr. Ordonez' notes could tell what he intended to rule out. By the time that Mr. Cummings visited Dr. Arnold, this physician wrote of swollen nodes, in the plural, and stated his intention to rule out a tumor. These facts would have caused an underwriter to delay issuance of this policy, outweighing other factors stated in the underwriting manual which might have been argued as in favor of issuance, such as the duration of the swelling and the location of the swollen node or nodes.[5]

5. This conclusion makes it unnecessary to resolve the conflicts in the various physicians' records concerning when Mr. Cummings first experienced symptoms, an issue to which the parties

In summary, the court answers the questions posed by the parties by finding that the misrepresentation in this case consisted of the nondisclosure of Mr. Cummings' visit to Dr. Ordonez, and by concluding that had Mr. Cummings disclosed this, Kemper's investigation in the normal course of underwriting would have led to refusal to issue the policy applied for, in light of the course of events in the last year of Mr. Cummings' life. The defendant Kemper having carried its burden under Tennessee Code Annotated § 56–7–103, the court will enter judgment in its favor in this civil action.

devoted some argument in this litigation. Reading the evidence in the light most favorable to the plaintiff does not alter the court's conclusion. The court does not make any finding that Mr. Cummings misrepresented to Kemper the length of time during which he experienced the symptoms which caused him to consult Dr. Ordonez.